**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOSEPH LAMB, individually and on behalf of all others similarly situated, | **Case No. 1:22-cv-06319-ALC** |
| Plaintiff, | **AMENDED CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| FORBES MEDIA LLC, | |
| Defendant. | |

Plaintiff Lamb ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action suit brought on behalf of all persons with Facebook accounts who subscribe to Forbes and view videos on forbes.com.

2.      Forbes Media LLC ("Defendant" or "Forbes") develops, owns, and operates forbes.com, which is a "global media, branding and technology company, with a focus on news and information about business, investing, technology, entrepreneurship, leadership and affluent lifestyles."[1]

3.      Plaintiff brings this action in response to Defendant's practice of knowingly disclosing its subscribers' personally identifiable information—including a record of every video clip they view—to Facebook without consent.

---

[1] FORBES, LINKEDIN, https://www.linkedin.com/company/forbes-magazine/.

4. The United States Congress passed the Video Privacy Protection Act ("VPPA") in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

5. Defendant violated the VPPA by knowingly transmitting Plaintiff's and the putative class's personally identifiable information to unrelated third parties.

## FACTUAL BACKGROUND

### I.    The VPPA

6. The origins of the VPPA begin with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that history. With an eye toward the digital future, Congress responded by passing the VPPA. As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

7. The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information as "information

which identifies a person as having requested or obtained specific video materials or services

from a video service provider."  18 U.S.C. § 2710(a)(3).  A video tape service provider is "any

person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or

delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. §

2710(a)(4).

## II.     The Facebook Tracking Pixel

8.      Facebook is the largest social networking site on the planet, touting 2.9 billion

monthly active users.[2]  Facebook describes itself as a "real identity platform,"[3] meaning users

are allowed only one account and must share "the name they go by in everyday life."[4]  To that

end, when creating an account, users must provide their first and last name, along with their

birthday and gender.[5]

9.      Facebook generates revenue by selling advertising space on its website.[6]

10.       Facebook sells advertising space by highlighting its ability to target users.[7]

Facebook can target users so effectively because it surveils user activity both on and off its site.[8]

---

[2] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html

[3] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[4] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[5] FACEBOOK, SIGN UP, https://www.facebook.com/

[6] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales.*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

[7] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[8] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[9]  Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[10]

11.     Advertisers can also build "Custom Audiences."[11]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[12] Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[13]   Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[14] One such Business Tool is the Facebook Tracking Pixel.

---

[9] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[10] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[11] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[12] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE, https://www.facebook.com/business/help/366151833804507?id=300360584271273.

[13] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[14] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

12.     The Facebook Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website.  Once activated, the Facebook Tracking Pixel "tracks the people and type of actions they take."[15]  When the Facebook Tracking Pixel captures an action, it sends a record to Facebook.  Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

13.     Advertisers control what actions—or, as Facebook calls it, "events"—the Facebook Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views.[16]  Advertisers can also configure the Facebook Tracking Pixel to track other events.  Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[17]  An advertiser can also create their own tracking parameters by building a "custom event."[18]

14.     Advertisers control how the Facebook Tracking Pixel identifies visitors.  The Facebook Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[19]  HTTP Headers collect "IP addresses, information about the web browser, page

---

[15] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

[16] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.

[17] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[18] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.

[19] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.

location, document, referrer and persons using the website."[20]  Pixel-specific Data includes "the Pixel ID and cookie."[21]

### III.     Forbes And The Facebook Pixel

15.     Forbes hosts and delivers thousands of videos, featuring them as standalone content and embedding them into articles.

16.     Forbes monetizes these videos through advertisements that begin playing prior to delivering the content.

**Figure 1**



17.     Forbes also monetizes videos by placing advertisements alongside the content.

---

[20] *Id.*

[21] *Id.*

**Figure 2**



18.     Forbes hosts the Facebook Tracking Pixel and transmits four distinct events to Facebook:[22]

**Figure 3**



19.     PageView transmits the Uniform Resource Locator ("URL") accessed, along with whether that webpage features a video.

---

[22] This data derives from a tool created and offered by Facebook.

**Figure 4**



20.     ViewContent likewise discloses the URL and whether the webpage features a video.

**Figure 5**



21.     The title for the video is contained in the URL, and any third-party can copy and paste that locator into a web browser and determine the video that the subscriber watched.

22.     These two events, independently and jointly, permit an ordinary person to identify a video's content, title, and location.

23.     The title for the video is contained in the URL, and any third-party can copy and paste that locator into a web browser and determine the video that the subscriber watched.

24.     When a visitor watches a video on Forbes's website while logged into Facebook, Defendant compels a visitor's browser to transmit the c_user cookie to Facebook.  The c_user cookie contains that visitor's unencrypted Facebook ID.  When accessing the above video, for example, Forbes compelled the browser to send eight cookies:

**Figure 6**

| fr | 06vG76PmkbPzUxLM8... | .facebook.com |
|----|----------------------|---------------|
| xs | 21%3ANWcv1qae6_Q... | .facebook.com |
| wd | 1005x927 | .facebook.com |
| c_user | 100035966074568 | .facebook.com |
| datr | nhkEYqJEsrPXFCfr7g54... | .facebook.com |
| sb | IJwCYtyFD-DWJjfFw3C... | .facebook.com |
| presence | C%7B%22t3%22%3A... | .facebook.com |
| _fbp | fb.1.1641423050382.6... | .forbes.com |

25.     When a visitor's browser has recently logged out of Facebook,  Forbes will compel the browser to send a smaller set of cookies:

**Figure 7**

| locale | en_US | .facebook.com |
|--------|-------|---------------|
| fr | 0pKtLceWeLaGmZ4Bn.... | .facebook.com |
| wd | 869x927 | .facebook.com |
| datr | nhkEYqJEsrPXFCfr7g54... | .facebook.com |
| sb | IJwCYtyFD-DWJjfFw3C... | .facebook.com |
| _fbp | fb.1.1641423050382.6... | .forbes.com |

26.     The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[23]   The _fbp cookie contains, at least, an unencrypted value that uniquely identifies a browser.[24]   The datr cookies also identifies a browser.[25]   Facebook, at a minimum, uses the fr and _fbp cookies to identify users.[26]

27.     If a visitor has never created a Facebook account, three cookies are transmitted:

**Figure 8**

| fr | 0ocnoN7k9QCN9... | .facebook.c... |
| sb | yGMFYtV4z44zEb... | .facebook.c... |
| _fbp | fb.1.16445203905... | .forbes.com |

28.     Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser.   The _fbp cookie contains, at least, an unencrypted value that uniquely identifies a browser.   Facebook uses both for targeted advertising.

29.     The fr cookie will expire after 90 days unless the visitor's browser logs back into Facebook.[27]   If that happens, the time resets, and another 90 days begins to accrue.[28]

---

[23] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012),  http://www.europe-v-facebook.org/ODPC_Review.pdf.

[24] FACEBOOK, CONVERSION API, https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/fbp-and-fbc/.

[25] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[26] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[27] See FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[28] Confirmable through developer tools.

30.     The _fbp cookie will expire after 90 days unless the visitor's browser accesses the same website.[29]  If that happens, the time resets, and another 90 days begins to accrue.[30]

31.     The Facebook Tracking Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, Forbes.[31]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[32]  The _fbp cookie is always transmitted as a first-party cookie.  A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

32.     Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

33.     A Facebook ID is personally identifiable information.  Any ordinary can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of Facebook.com. Facebook admits as much on its website.

34.     Through the Facebook Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Facebook to know, among other things, what Forbes videos a user has watched.[33]

---

[29] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[30] Also confirmable through developer tools.

[31] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie.  This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[32] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  This is also confirmable by tracking network activity.

[33] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

35.     Forbes also uses "Advanced Matching."  When activated, the Facebook Tracking Pixel will "look for recognizable form field and other sources on your website that contain information such as first name, last name and email." [34]  The Facebook Tracking Pixel's code will collect that information, "along with the event, or action, that took place."[35]  This information is "hashed,"[36] meaning it is "[a] computed summary of digital data that is a one-way process."[37]  In other words, it "cannot be reversed back into the original data."[38]

36.     Forbes discloses this information so it can better match visitors to their Facebook profiles, which thereby allows Forbes to better track analytics and target its advertisements.

**Figure 9**



You can use Advanced Matching to help:

- Increase the number of attributed conversions. We can match more of the conversions that happen on your website to people on Meta. This helps you understand the impact of your ads on website conversions.

- Increase your Custom Audience size. We're able to better match your website visitors to people on Meta and increase the size of your Custom Audience.

- Decrease the cost per conversion. Conversion-optimized campaigns become more efficient because we can better identify and deliver ads to the types of people likely to take the actions you care about.

---

[34] https://www.facebook.com/business/help/611774685654668?id=1205376682832142

[35] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

[36] DEFINITION OF HASH, https://www.pcmag.com/encyclopedia/term/hash

[37] *Id.*

[38]  *Id.*

37.     Forbes's Facebook Tracking Pixel is configured to scan form fields containing a

user's email, first name, and last name:[39]

**Figure 10**

```
fbq.registerPlugin("1494993704116832", {__fbEventsPlugin: 1, plugin: function(fbq, instance, config) { config.set("1494993704116832", "inferredEvents",
fbq.loadPlugin("inferredevents");
fbq.loadPlugin("identity");
fbq.loadPlugin("jsonld_microdata");
instance.optIn("1494993704116832", "InferredEvents", true);
fbq.loadPlugin("jsonld_microdata");
instance.optIn("1494993704116832", "MicrodataJsonLd", true);
config.set("1494993704116832", "automaticMatching", {"selectedMatchKeys":["em","fn","ln","ph","ge","zp","ct","st","country","db","external_id"]});
fbq.loadPlugin("inferredevents");
fbq.loadPlugin("identity");
instance.optIn("1494993704116832", "AutomaticMatching", true);
fbq.loadPlugin("iwlbootstrapper");
instance.optIn("1494993704116832", "IWLBootstrapper", true);
fbq.loadPlugin("iwlparameters");
fbq.loadPlugin("inferredevents");
instance.optIn("1494993704116832", "IWLParameters", true);
fbq.set("iwlExtractors", "1494993704116832", []);
fbq.loadPlugin("cookie");
instance.optIn("1494993704116832", "FirstPartyCookies", true);
fbq.loadPlugin("inferredevents");
fbq.loadPlugin("microdata");
fbq.loadPlugin("identity");
instance.optIn("1494993704116832", "AutomaticSetup", true);
fbq.loadPlugin("automaticmatchingforpartnerintegrations");
instance.optIn("1494993704116832", "AutomaticMatchingForPartnerIntegrations", true);
config.set(null, "batching", {"batchWaitTimeMs":501,"maxBatchSize":10});
config.set(null, "microdata", {"waitTimeMs":500});
```

38.     Before subscribing, a user must create an account.  Forbes's account webpage

contains form fields for first name, last name, email address, job level and job function.  *See*

Figure 13.

39.     Every subsequent log-in attempt requires subscribers to input their email:

---

[39] Facebook provides a corresponding look-up table: FACEBOOK, ADVANCED MATCHING,
https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching.

**Figure 11**



40.     Forbes discloses a subscriber's email address, first name and last name when inputted into any of the above form fields, enabling Facebook to then match those identifiers with that subscriber's subsequent activity on the site.

41.     Forbes knows that Facebook will match the Advanced Matching parameters with a subscriber's subsequent activity, thereby helping Forbes "[i]ncrease the number of attributed conversions," "[i]ncrease [its] Custom Audience size," and "[d]ecrease the cost per conversion."[40]

42.     By compelling a visitor's browser to disclose the Advanced Matching parameters alongside event data for videos, Forbes knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

---

[40] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB,
https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

43.     By compelling a visitor's browser to disclose the c_user cookie alongside event data for videos, Forbes knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

44.     By compelling a visitor's browser to disclose the fr and _fbp cookies alongside event data for videos, Forbes discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

45.     By compelling a visitor's browser to disclose the fr cookie and other browser identifiers alongside event data for videos, Forbes discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

46.     Facebook confirms that it matches activity on Forbes with a user's profile. Facebook allows users to download their "off-site activity," which is a "summary of activity that businesses and organizations share with us about your interactions, such as visiting their apps or websites."[41]  Here, the off-site activity report confirms that Forbes identifies an individual's reading and video viewing activities:

**Figure 12**



| Activity received from forbes.com | |
|---|---|
| ID | 1494993704116832 |
| Event | PAGE_VIEW |
| Received on | December 2, 2021 at 6:04 PM |
| ID | 1494993704116832 |
| Event | PAGE_VIEW |
| Received on | November 19, 2021 at 3:49 PM |

---

[41] FACEBOOK, WHAT IS OFF-FACEBOOK ACTIVITY?,
https://www.facebook.com/help/2207256696182627

47.     The "ID" shown here is the same Facebook Pixel ID visible in the first image. The Facebook Pixel ID is a numerical code that uniquely identifies each Pixel.[42]  In practice, this means Forbes's Facebook Tracking Pixel has a Pixel ID that differs from all other websites.  All subscribers who view videos on forbes.com can pull their off-site activity report and see the same Pixel ID.

48.     Individuals can subscribe to Forbes by signing up for a free account.

### III.    Experience of Plaintiff Joseph Lamb

49.     In 2018, Plaintiff Lamb subscribed to Forbes by creating an account through the Facebook button:

**Figure 13**



---

[42] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

50.     When Plaintiff Lamb clicked the button, he was redirected to Facebook.  After entering his Facebook credentials,  Plaintiff Lamb then clicked continue, and when he did, Facebook disclosed to Forbes, at a minimum, his name and email address, which Forbes then used to create his account.

51.     In or around 2009, Plaintiff Lamb created a Facebook account.  Since creating an account, Plaintiff Lamb frequented Forbes's website to, among other things, watch videos.

52.     When Plaintiff Lamb watched videos on Forbes's website, Defendant disclosed his event data, which recorded and disclosed the video's title and URL.  Alongside this event data, Defendant also disclosed identifiers for Plaintiff Lamb, including the c_user and fr cookies.

53.     By disclosing his event data and identifiers, Defendant disclosed Plaintiff Lamb's personally identifiable information to a third-party.

54.     Plaintiff Lamb discovered that Defendant surreptitiously collected and transmitted his personally identifiable information in June 2022.

## PARTIES

55.     Plaintiff Lamb is, and has been at all relevant times, a resident of Minneapolis, Minnesota and has an intent to remain there, and is therefore a domiciliary of Minnesota.

56.     Defendant Forbes Media LLC is a Delaware corporation with its principal place of business at 60 5th Avenue New York, NY 10011.  Defendant develops, owns, and operates forbes.com, which is used throughout New York and the United States.

## JURISDICTION AND VENUE

57.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the VPPA).

58.     This Court has personal jurisdiction over Defendant because Defendant's principal place of business is in New York, New York.

59.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## CLASS ALLEGATIONS

60.     **Class Definition:**  Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the United States who have a Facebook account and a Forbes account, and who viewed videos on Forbes's website (the "Class").

61.     Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

62.     **Numerosity (Fed. R. Civ. P. 23(a)(1)):**  At this time, Plaintiff does not know the exact number of members of the aforementioned Class.  However, given the popularity of Defendant's website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

63.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):**  There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

    (a)  whether Defendant collected Plaintiff's and the Class's PII;

    (b)  whether Defendant unlawfully disclosed and continues to disclose its
         users' PII in violation of the VPPA;

    (c)  whether Defendant's disclosures were committed knowingly; and

(d) whether Defendant disclosed Plaintiff's and the Class's PII without consent.

64.     **Typicality (Fed. R. Civ. P. 23(a)(3)):**  Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, used Forbes's website to watch videos, and had his PII collected and disclosed by Defendant.

65.     **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and are represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and its state-inspired offspring. Plaintiff and their counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class.  Neither Plaintiff nor his counsel has any interest adverse to, or in conflict with, the interests of the absent members of the Class.  Plaintiff has raised viable statutory claims or the type reasonably expected to be raised by members of the Class, and will vigorously pursue those claims.  If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class, additional claims as may be appropriate, or to amend the definition of the Class to address any steps that Defendant took.

66.     **Superiority (Fed. R. Civ. P. 23(b)(3)):**  A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable.  Even if every member of the Class could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of

this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class.  Plaintiff anticipates no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
**VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT**
**18 U.S.C. § 2710, *et seq.***

67.      Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

68.      Defendant is a "video tape service provider" because it has created, hosted, and delivered hundreds of videos on its website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).  In particular, Defendant leverages its video to derive substantial revenues from advertisements that it intersperses in each video. Defendant also uses the videos to collect and disclose viewers' PII so it can later retarget them for advertisements.

69.      Plaintiff and members of the Class are "subscribers" and therefore "consumers" because they created a Forbes account  to read articles and watch videos on Forbes's website.  18 U.S.C. § 2710(a)(1).

70.      Forbes disclosed to a third party, Facebook, Plaintiff's and the Class members' personally identifiable information.  Forbes utilized the Facebook Tracking Pixel to compel Plaintiff's web browser to transfer Plaintiff's identifying information, like his Facebook ID, along with Plaintiff's event data, like the title of the videos he viewed.

71.     Plaintiff and the Class members viewed video clips using Forbes's website.

72.     Forbes knowingly disclosed Plaintiff's PII because it used that data to build audiences on Facebook and retarget them for its advertising campaigns.

73.     Plaintiff and class members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.

74.     Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA.  In particular, Forbes's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership."  18 U.S.C. § 2710(a)(2).

75.     On behalf of himself and the Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a)     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)     For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)     For an order finding in favor of Plaintiff and the Class on all counts asserted

        herein;

(d)     An award of statutory damages to the extent available;

(e)     For punitive damages, as warranted, in an amount to be determined at trial;

(f)     For prejudgment interest on all amounts awarded;

(g)     For injunctive relief as pleaded or as the Court may deem proper; and

(h)     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and

        expenses and costs of suit.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff demands a trial by jury of all issues so

triable.

Dated: November 4, 2022                          Respectfully submitted,


                                                 By: */s/ Joshua D. Arisohn*___


                                                 **BURSOR & FISHER, P.A.**
                                                 Joshua D. Arisohn
                                                 Philip L. Fraietta
                                                 888 Seventh Avenue
                                                 New York, NY 10019
                                                 Tel: (646) 837-7150
                                                 Fax: (212) 989-9163
                                                 E-Mail: jarisohn@bursor.com
                                                         pfraietta@bursor.com

                                                 **BURSOR & FISHER, P.A.**
                                                 Christopher R. Reilly*
                                                 701 Brickell Avenue, Suite 1420
                                                 Miami, FL 33131
                                                 Tel: (305) 330-5512
                                                 Fax: (305) 679-9006
                                                 E-Mail:  creilly@bursor.com

Gary M. Klinger*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: (866) 252-0878
gklinger@milberg.com

Nick Suciu III*
nsuciu@milberg.com
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
6905 Telegraph Rd., Suite 115
Bloomfield Hills, MI 48301
Tel: (313) 303-3472
Fax: (865) 522-0049

Andrew J. Shamis*
**SHAMIS & GENTILE, P.A.**
14 NE 1st Ave, Suite 705
Miami, Florida 33132
Telephone: (305) 479-2299
ashamis@shamisgentile.com


*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff and the Putative Class*