UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED:  9/28/23
```

LAMB, *individually and on behalf of all others
similarly situated*,

                                    Plaintiffs,

                    -against-

FORBES MEDIA LLC,

                                    Defendant.

22-cv-06319-ALC

**OPINION & ORDER**

**ANDREW L. CARTER, JR., DISTRICT JUDGE:**

Plaintiffs Joseph Lamb ("Lamb") and Amber Stouffe ("Stouffe") bring this putative class action against Defendant Forbes Media LLC ("Defendant" or "Forbes") alleging that the Defendant unlawfully disclosed Plaintiffs' personally identifiable information ("PII")—including a record of every video clip they view—without their consent to Facebook and thereby violated the Video Privacy Protection Act, 18 U.S.C. §2710 ("VPPA"). Defendant has moved to dismiss the Plaintiffs' Second Amended Complaint ("SAC"), ECF No. 26, in its entirety pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the following reasons, Defendant's motion pursuant to Rule 12(b)(1) is **DENIED** and Defendant's motion pursuant to Rule 12(b)(6) is **GRANTED**.

## BACKGROUND

### I.  Factual Background

The following facts are taken from the allegations contained in Plaintiff's Second Amended Complaint, which are presumed to be true for purposes of this motion to dismiss.

Forbes Media LLC develops, owns, and operates forbes.com, which is a "global media, branding and technology company, with a focus on news and information about business,

investing, technology, entrepreneurship, leadership and affluent lifestyles." SAC ¶ 2. Forbes hosts

and delivers thousands of videos, featuring them as standalone content and embedding them into

articles. *Id*. ¶ 15.

Plaintiffs allege that Forbes shared information with Facebook using software called the

"Facebook Tracking Pixel." *Id*. ¶¶ 18, 34. Facebook sells advertising space by highlighting its

ability to target users, which it does "so effectively because it surveils user activity both on and off

its site." *Id*. ¶ 10. The Facebook Tracking Pixel is a "piece of code" and is one of Facebook's

"Business Tools." *Id*. ¶¶ 11, 12. An advertiser can integrate the Facebook Tracking Pixel into their

website. *Id*. ¶ 12. Utilizing Facebooks' Business Tools allows an advertiser to "collect and transmit

data automatically" to Facebook. *Id*. ¶ 11. Once activated, the Facebook Tracking Pixel "tracks

the people and type of actions they take." *Id*. ¶ 12. When the Facebook Tracking Pixel captures an

action, it sends a record to Facebook, and once this record is received, Facebook processes it,

analyzes it, and assimilates it into datasets that can be later used by advertisers to target specific

audiences. *Id*.

Advertisers control what actions—or, as Facebook calls it, "events"—the Facebook

Tracking Pixel will collect, including the website's metadata, along with what pages a visitor

views. *Id*. ¶ 13. Plaintiffs allege that advertisers can also configure the Facebook Tracking Pixel

to track other events.  *Id*. Facebook offers "standard events" from which advertisers can choose,

including what content a visitor views or purchases made by the visitor. *Id*. An advertiser can also

create their own tracking parameters by building a "custom event." *Id*.

Additionally, advertisers control how the Facebook Tracking Pixel identifies visitors. *Id*. ¶

14. The Facebook Tracking Pixel is configured to automatically collect "HTTP Headers" and

"Pixel-specific Data." *Id*. HTTP Headers collect "IP addresses, information about the web

browser, page location, document, referrer and persons using the website." *Id.* Pixel-specific Data includes "the Pixel ID and cookie." *Id.*

Plaintiffs allege that Forbes hosts the Facebook Tracking Pixel and transmits four distinct events to Facebook: (1) "PageView," (2) "ViewContent," (3) "Purchase," and (4) "Lead."[1] *Id.* ¶ 18, Fig. 3. "PageView" transmits the Uniform Resource Locator ("URL") accessed, along with whether that webpage features a video. *Id.* ¶ 19. "ViewContent" also discloses the URL and "whether the webpage features a video." *Id.* ¶ 20. The title for the video is contained in the URL, and Plaintiffs allege that "any third party can copy and paste that locator into a web browser and determine the video that the subscriber watched" and that "these two events [PageView and ViewContent] independently and jointly, permit an ordinary person to identify a video's content, title, and location. *Id.* ¶¶ 21–22. The title for the video is contained in the URL, and any third party can copy and paste that locator into a web browser and determine the video that the subscriber watched. *Id.* ¶ 23.

Additionally, when a visitor watches a video on Forbes's website while logged into Facebook, Defendant Forbes compels a visitor's browser to transmit the "c_user cookie" to Facebook, which contains that visitor's unencrypted Facebook ID. *Id.* ¶ 24. When a visitor's browser has recently logged out of Facebook, Forbes will "compel the browser to send a smaller set of cookies." *Id.* ¶ 25. Even without a corresponding Facebook ID, one of the cookies sent to Facebook contains, at least, an abbreviated and encrypted value that identifies the browser. *See* SAC, Figs. 6-8. According to Plaintiffs, a Facebook ID is "personally identifiable information," and that any ordinary [person] can identify a Facebook profile—and all the personal information publicly listed on that profile—by appending the Facebook ID to the end of Facebook.com. *Id.*

---

[1] Plaintiffs' SAC does not specifically define "Purchase" or "Lead."

¶33. Through the Facebook Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Facebook to know, among other things, what Forbes videos a user has watched. *Id*. ¶ 34.

Forbes also uses "Advanced Matching." *Id*. ¶ 35. When this tool is activated, the Facebook Tracking Pixel will "look for recognizable form field and other sources on your website that contain information such as first name, last name and email." *Id*. The Facebook Tracking Pixel's code will collect that information, "along with the event, or action, that took place." *Id*. This information is "hashed," meaning it is "[a] computed summary of digital data that is a one-way process." *Id*. In other words, it "cannot be reversed back into the original data." *Id*. Forbes discloses this information so it can better match visitors to their Facebook profiles, which thereby allows Forbes to better track analytics and target its advertisement. *Id*. ¶ 36.

To subscribe to Forbes, a user can create account. *Id*. ¶ 38. Forbes' account webpage contains form fields for first name, last name, email address, job level, and job function. *Id*. Every subsequent log-in attempt requires subscribers to input their email. *Id*. ¶ 39. Plaintiffs allege that Forbes discloses a subscriber's email address, first name and last name when inputted, enabling Facebook to then match those identifiers with that subscriber's subsequent activity on the site. *Id*. ¶ 40. The SAC states that "by compelling a visitor's browser to disclose the Advanced Matching parameters, the c_user cookie, fr and _fbp cookies alongside event data for videos, Forbes knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior." *Id*. ¶¶ 42–44.

Plaintiff Joseph Lamb alleges that he subscribed to Forbes by creating an account through the Facebook button. *See* SAC, Fig 13. When Plaintiff Lamb clicked the button, he was redirected to Facebook. *Id*. ¶ 51. After entering his Facebook credentials, Plaintiff Lamb then clicked

continue, and when he did, Facebook disclosed to Forbes, at a minimum, his name and email address, which Forbes then used to create his account. *Id*. In or around 2009, Plaintiff Lamb created a Facebook account, and since creating an account, Plaintiff Lamb frequented Forbes's website to, among other things, watch videos. *Id*. ¶ 52. Plaintiff alleges that when he watched videos on Forbes' website, Defendant disclosed his event data, which recorded and disclosed the video's title and URL. *Id*. ¶ 53. Alongside this event data, Defendant also disclosed identifiers for Plaintiff Lamb, including the "c_user" and "fr" cookies. *Id*. Plaintiff Lamb alleges he discovered that Defendant collected and transmitted his personally identifiable information in June 2022. *Id*. ¶ 55.

In November 2021, Plaintiff Stouffe alleges that she subscribed to Forbes by signing up for a newsletter, "Forbes Vetted," that Forbes created, advertising it as providing information "on sales and deals, plus the latest fashion, home and tech products." *Id*. ¶ 56. To sign up for the newsletter, Plaintiff Stouffe had to input her email address and, unbeknownst to her, Forbes allegedly disclosed her email address to Facebook using the aforementioned Advanced Matching tools. *Id*. ¶¶ 57–58. In or around 2011, Stouffe created a Facebook account and, since creating an account, she frequented Forbes's website to, among other things, watch videos. *Id*. ¶ 59. Plaintiff alleges that when she watched videos on Forbes' website, Defendant disclosed her event data, which recorded and disclosed the video's title and URL. *Id*. ¶ 60. Alongside this event data, Defendant also disclosed identifiers for Plaintiff Stouffe, including the "c_user" and "fr" cookies. *Id*. Plaintiff Stouffe alleges she discovered that Defendant collected and transmitted her personally identifiable information in November 2022. *Id*. ¶ 62.

## II. Procedural Background

Plaintiff Lamb filed the initial complaint in this action on July 26, 2022. ECF No. 1. On November 4, 2022, Plaintiff filed an Amended Complaint, ECF No. 15, and on December 23,

5

2022, Plaintiff Lamb filed a Second Amended Complaint, adding Stouffe as an additional plaintiff. SAC, ECF No. 22. On February 27, 2023, Defendant filed its motion to dismiss, ECF No. 26, alongside a declaration, ECF No. 27, and a memorandum of law. Mot., ECF No. 28. Plaintiffs filed their opposition on March 29, 2023. Opp., ECF No. 29. On April 12, 2023, Defendant filed its reply memorandum. Reply, ECF No. 31. After the motion to dismiss was fully briefed, the parties filed several letters of supplemental authorities advising the Court of cases from within and outside this Circuit. *See* ECF Nos. 32, 33, 36–40, 42.

On August 10, 2023, the Court ordered Plaintiffs to file evidence, such as an affidavit, to controvert Defendant's extrinsic evidence related to its fact-based Rule 12(b)(1) motion or to file a letter indicating they wish to rely solely on the jurisdictional allegations in their Second Amended Complaint. *See* Order, ECF No. 41. On August 21, 2023, Plaintiffs Lamb and Stouffe filed declarations in support of their opposition to Defendant's motion to dismiss. *See* ECF Nos. 43–44. Defendant filed a supplemental letter response to the Plaintiffs' declarations on August 25, 2023. ECF No. 45. The Court has considered these supplemental letters and Plaintiffs' declarations. The motion is deemed fully briefed.

## STANDARD

### I. Rule 12(b)(1) Standard

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

In reviewing a motion to dismiss under Rule 12(b)(1), a court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings

inferences favorable to the party asserting it." *Morrison v. Nat'l Australia Bank Ltd*., 547 F.3d 167, 170 (2d Cir. 2008) (citation and internal quotation marks omitted). Rather, "[t]he plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc*., 426 F.3d 635, 638 (2d Cir. 2005). Courts "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [the Court] may not rely on conclusory or hearsay statements contained in the affidavits." *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004).

A Rule 12(b)(1) motion challenging subject matter jurisdiction may be either facial or fact-based. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). "When the Rule 12(b)(1) motion is facial, *i.e.*, based solely on the allegations of the complaint or the complaint and exhibits attached to it (collectively the 'Pleading'), the plaintiff has no evidentiary burden" and "[t]he task of the district court is to determine whether the Pleading allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue." *Id*. (cleaned up).

Alternatively, as explained in the Court's Order dated August 10, 2023, *see* ECF No. 41, "a defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the Pleading." *Id*. at 57 (citations omitted). "In opposition to such a motion, the plaintiffs will need to come forward with evidence of their own to controvert that presented by the defendant 'if the affidavits submitted on a 12(b)(1) motion . . . reveal the existence of factual problems' in the assertion of jurisdiction." *Id*. (quoting *Exchange National Bank of Chicago v. Touche Ross & Co*., 544 F.2d 1126, 1131 (2d Cir. 1976)). "However, the plaintiffs are entitled to rely on the allegations in the [Complaint] if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." *Id*. "Supreme Court caselaw makes clear that district courts have broad discretion when determining how to

consider challenges to subject matter jurisdiction." *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 441 (2d Cir. 2022). But "[w]here a party offers extrinsic evidence that contradicts the material allegations of the complaint, . . . it would be error for the district court to disregard that extrinsic evidence." *Id*. at 442. "If the extrinsic evidence presented by the defendant is material and controverted, the district court will need to make findings of fact in aid of its decision as to standing." *Carter*, 822 F.3d at 57. Rule 12(b)(6) Standard

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp*., 482 F.3d 184, 191 (2d Cir. 2007). However, the Court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Claims should be dismissed when a plaintiff has not pleaded enough facts that "plausibly give rise to an entitlement for relief." *Id*. at 679. A claim is plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678, (citing *Twombly*, 550 U.S. at 556). While not akin to a "probability requirement," the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). Accordingly, where a plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. (quoting *Twombly*, 550 U.S. at 557). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

## II. Video Privacy Protection Act

The Video Privacy Protection Act ("VPPA") was passed in 1988 after a newspaper published a list of 146 films that the family of Supreme Court nominee Robert Bork had rented from a video store. *See Salazar v. Nat'l Basketball Ass'n*, No. 1:22-CV-07935 (JLR), —— F.Supp.3d at ——, 2023 WL 5016968, at *4 (S.D.N.Y. Aug. 7, 2023) (citing *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 278 (3d Cir. 2016)); S. Rep. No. 100-599, at 5 (1988). The VPPA creates a private right of action for plaintiffs to sue persons who disclose information about their video-watching habits. *Id*. It provides that "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person[ ]." 18 U.S.C. § 2710(b)(1).

The Act defines the following terms relevant here:

> (1) "consumer" means any renter, purchaser, or subscriber of goods or services from a video tape service provider; ....
> (3) "personally identifiable information" includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider; and
> (4) "video tape service provider" means any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials ....

18 U.S.C. § 2710(a). "In 2013, Congress amended the pre-Internet VPPA to—in the words of amendment sponsor Rep. Bob Goodlatte—'reflect the realities of the 21st century,' but it did not alter any of the VPPA's substantive definitions." *Golden v. NBCUniversal Media, LLC*, No. 22 CIV. 9858 (PAE), 2023 WL 5434378, at *4 (S.D.N.Y. Aug. 23, 2023) (quoting 158 CONG. REC. H6849-01 (daily ed. Dec. 18, 2012)). "To state a claim under § 2710(b), a plaintiff must allege that (1) a defendant is a 'video tape service provider,' (2) the defendant disclosed 'personally identifiable information concerning any consumer' to 'any person,' (3) the disclosure was made knowingly, and (4) the disclosure was not authorized by another part of the statute." *Salazar*, ——

F.Supp.3d at ——, 2023 WL 5016968, at *4 (quoting *Martin v. Meredith Corp.*, —— F.Supp.3d at ——, No. 22CV4776 (DLC), 2023 WL 2118074, at *3 (S.D.N.Y. Feb. 17, 2023), *appeal withdrawn*, No. 23-412, 2023 WL 4013900 (2d Cir. May 24, 2023)).

## DISCUSSION

Plaintiffs bring a claim under the Video Privacy Protection Act, 18 U.S.C. §2710 ("VPPA"). Defendant asserts the Plaintiff lacks Article III standing to bring this action and that the SAC fails to state a claim for upon which relief can be granted. Defendant argues that Plaintiffs fail to state a claim under the VPPA because (1) Forbes is not a video tape services provider; (2) the information allegedly disclosed is not personally identifiable information ("PII"); (3) Plaintiffs fail to allege Forbes knowingly disclosed their PII to a third party and (4) Plaintiffs are not "subscribers" under the VPPA.

Defendant seeks to dismiss Plaintiffs' SAC for lack of standing—that is, for Plaintiffs' failure to allege a concrete injury—and for failure to state a claim. Accordingly, the Court will first address the threshold issue of Article III standing. *Carter v. Scripps Networks*, LLC, —— F.Supp.3d ——, No. 22-CV-2031 (PKC), 2023 WL 3061858, at *2 (S.D.N.Y. Apr. 24, 2023). The Court will only analyze Defendant's remaining arguments if the Court has subject matter jurisdiction over this case. *See De Medicis v. Ally Bank*, No. 21 Civ. 6799 (NSR), 2022 WL 3043669, at *4 (S.D.N.Y. Aug. 2, 2022) (citing *Brokamp v. James*, 573 F.Supp.3d 696, 703 (N.D.N.Y. 2021)).

### I.   Standing

A plaintiff's standing to sue the defendant is a "threshold question in every federal case." *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). A party must have Article III standing— "the personal interest that must exist at

the commencement of the litigation." *Carter*, 822 F.3d at 55 (citing *Davis v. FEC*, 554 U.S. 724, 732 (2008)). A standing issue may be raised at any stage in a litigation, *see id.* (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006)), and "the party invoking federal jurisdiction bears the burden of establishing the elements." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Under the U.S. Constitution, the jurisdiction of the federal courts is limited to "cases" and "controversies." U.S. Const., Art. III, § 2. "The doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 156 (2014) (quoting *Lujan*, 504 U.S. at 560).

There are three Article III standing requirements: (1) the plaintiff must have "suffered an injury-in-fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *John v. Whole Foods Market Group, Inc.*, 858 F.3d 732, 736 (2d Cir. 2017) (citing *Lujan*, 504 U.S. at 560–61).

## A. Injury-in-Fact

Here, the parties dispute whether Plaintiffs have established the first element of the standing test: injury-in-fact. Defendant argues that Plaintiffs lack Article III standing because they have not alleged a concrete harm as required by *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016), *as revised* (May 24, 2016).

An injury-in-fact consists of "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Whole Foods Market Group, Inc.*, 858 F.3d at 736 (quoting *Spokeo*, 578 U.S. at 339 (quotation marks omitted); *TransUnion LLC v. Ramir*ez, ––– U.S. –––, 141 S.Ct. 2190, 2203 (2021) (Plaintiffs must allege "injury in fact that is concrete, particularized, and actual or imminent."). The Supreme Court "has

rejected the proposition that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'" *Id.* at 2204-07 (quoting *Spokeo*, 578 U.S. at 341). "Article III standing requires a concrete injury even in the context of a statutory violation." *Id*. Additionally, "with respect to the concrete-harm requirement," the Supreme Court's opinion in *Spokeo* "indicated that courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Id*. at 2204 (quoting *Spokeo*, 578 U.S. at 341). "That inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id*.

As explained by Judge Rochon in a recent VPPA suit, "prior to *TransUnion*, courts [] consistently found that plaintiffs satisfy the concreteness requirement of Article III standing where they allege[d] a deprivation of their privacy rights under the VPPA" and that "under *TransUnion*, the Court must ask whether Plaintiff[s] suffered a concrete harm by looking to traditionally recognized injuries." *Salazar*, ⸺ F.Supp.3d at ⸺, 2023 WL 5016968, at *5.

As explained in the Court's Order dated August 10, 2023, ECF No. 41, here, Defendant makes a fact-based Rule 12(b)(1) challenge in its motion to dismiss, relying on extrinsic evidence, namely the Declaration of David Johnson ("Johnson Decl."). ECF No. 27. The Court must first decide if the affidavit submitted by Defendant "reveal[s] the existence of factual problems in the assertion of jurisdiction." *Carter*, 822 F.3d at 57 (citations omitted). If the evidence beyond the pleading does reveal such factual problems, then the Plaintiffs "will need to come forward with evidence of their own to controvert that presented by defendant." *Id*. If the evidence proffered by the Defendant is "immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing," then the Court need only rely on the allegations in

Plaintiffs' Complaint. *Id.*; *Harty*, 28 F.4th at 441 ("It is only where jurisdictional facts are placed in dispute that the court has the obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." (quotations omitted)). "If the extrinsic evidence presented by the defendant is material and controverted, the district court will need to make findings of fact in aid of its decision as to standing." *Id.*; *see also Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 121 (2d Cir. 2017) ("Going forward, where a defendant makes a fact-based Rule 12(b)(1) challenge to jurisdiction, we are confident that district courts will oversee the appropriate extent of fact-finding necessary to resolve the contested issue, and parties should be on renewed notice of both the right to introduce such evidence and the plaintiff's burden of proof to do so even at the motion-to-dismiss stage.")

### i.   Defendant's Evidence Beyond the Pleading

In his declaration, David Johnson explains that he is the "Chief Data Officer" of Forbes. Johnson Decl. ¶ 3. On September 20 and 22, 2022 and January 22, 2023, "Forbes' employees conducted multiple diligent searches of its print and digital subscription, email and newsletter systems for the e-mail address for Plaintiff Joseph Lamb provided to Forbes by Plaintiffs' counsel in an effort to locate any and all records relating to Mr. Lamb." *Id.* ¶ 4. According to Mr. Johnson, "those records show that Mr. Lamb registered for the Forbes website on July 14, 2022," "that he accessed written news articles on the Forbes website before and after he registered," and that "Mr. Lamb did not access any Forbes webpages dedicated solely to video content." *Id.* ¶ 5. Additionally, "[c]ertain written news articles Mr. Lamb accessed included separate videos selected at random from the Forbes library that automatically play when a user accesses the webpage ('dynamically-generated videos')." *Id.* ¶ 6. "The dynamically-generated videos change each time the written news article is accessed, and have a different title and URL than the written news article the user

requested." As a result, Mr. Johnson states, "a Forbes website user has no way of knowing which video will play when they click on a written news article, or if a video will play at all." *Id*.

Additionally, on January 3, 4, 10, 18, and 19, 2023, Forbes' employees conducted "multiple diligent searches of its print and digital subscription, email and newsletter systems for the e-mail address for Plaintiff Amber Stouffe provided to Forbes by counsel for Plaintiff in an effort to locate records relating to Ms. Stouffe." *Id*. ¶ 7. Mr. Johnson reviewed the report on the searches conducted and concludes that "[t]hose records show that on or around October 13, 2021, Ms. Stouffe signed up for emails, and on November 2, 2022, Ms. Stouffe registered for the Forbes website." *Id*. ¶ 8. According to Johnson, the "records also reveal that on October 28, 2022, before she registered for the Forbes website, Ms. Stouffe accessed a single Forbes written news article that she located through a Google search." *Id*. That article, "'The Old Crow's A Disaster!': Trump Roasts McConnell Over Debt Ceiling Deal" included an autoplayed, dynamically-generated video. *Id*. Finally, Johnson explains that "Ms. Stouffe did not access any Forbes webpages dedicated solely to video content." *Id*. ¶ 9.

### ii. Defendant's Evidence is Material and Controverted

Defendant argues that Plaintiffs lack standing as neither has been injured in any way recognizable under federal law and that Plaintiff Lamb's injury "was manufactured for purposes of this suit." Mot. at 1. Defendant asserts Plaintiffs lack Article III standing because they have not alleged a concrete harm. *Id*. at 4. Specifically, Defendant argues that because the VPPA "only applies where what is disclosed 'includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider'" and because Plaintiffs did not choose to view any video on the Forbes website, Plaintiffs have suffered no injury. *Id*. at 4-5 (quoting 18 U.S.C. § 2710(a)(3)). Furthermore, Defendant asserts that because

Plaintiff Lamb "registered for the Forbes website on July 14, 2022"—12 days before the initial complaint was filed—Mr. Lamb is trying to establish injury for standing purposes based on a self-inflicted injury. *Id*. at 5; Johnson Decl. ¶ 5.

In their opposition, Plaintiffs assert that their injury-in-fact here is the disclosure of their personally identifiable information to a third party, Facebook, in violation of the VPPA. SAC ¶ 80; Opp. at 3-6. The VPPA states that a "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person" for relief. 18 U.S.C. § 2710(b)(1). "Personally identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). In *Martin v. Meredith Corp*., Judge Cote concluded, in a VPPA suit, that a plaintiff's allegations that the defendants disclosed his private information to a third party without his consent was sufficient to confer standing, noting that *TransUnion* cited the disclosure of private information as a type of traditional harm capable of redress. *Martin*, ⸺ F.Supp.3d at ⸺, 2023 WL 2118074, at *2 (S.D.N.Y. Feb. 17, 2023), *appeal withdrawn*, No. 23-412, 2023 WL 4013900 (2d Cir. May 24, 2023); *see also Salazar*, ⸺ F.Supp.3d at ⸺, 2023 WL 5016968, at *7 (collecting cases); *Carter*, ⸺ F.Supp.3d at ⸺, 2023 WL 3061858, at *3.

Based on this persuasive authority, the Court agrees that "at the pleading stage, [a] defendant[]'[s] alleged disclosure of plaintiffs' personal information and viewing activities describes [a] traditionally recognized harm" that is enough to confer standing. *Carter*, ⸺ F.Supp.3d at ⸺, 2023 WL 3061858, at *3.

Defendant contend that its extrinsic evidence contradicts Plaintiffs' allegations that they ever requested or obtained specific video materials on the Forbes webpage. Johnson Decl. ¶ 5

("records show that Mr. Lamb registered for the Forbes website on July 14, 2022," "that he accessed written news articles on the Forbes website before and after he registered," and that "Mr. Lamb did not access any Forbes webpages dedicated solely to video content."). According to Defendant, if the Plaintiffs never accessed any video materials or content on the Forbes website, then it would be impossible for Forbes to disclose PII or the plaintiffs' viewing activities to a third party (Facebook). Therefore, without the disclosure of private information, there is no injury-in-fact.

The Court agrees with Defendant that its extrinsic evidence is material insofar that it contradicts Plaintiffs' allegations that they ever requested or obtained specific video materials, countering their allegation that their private information was disclosed in the first place. Whether Plaintiffs' private information was disclosed creates a jurisdictional dispute because there is no concrete harm without disclosure of private information. *See Salazar*, —— F.Supp.3d at ——, 2023 WL 5016968, at *5 ("Several courts have held these allegations to be sufficient to establish concrete injury (and standing) post-*TransUnion* because the 'disclosure of private information is a harm that courts have traditionally considered to be redressable.'") (quoting *Carter*, —— F.Supp.3d at ——, 2023 WL 3061858, at *3)). Although "plaintiffs are entitled to rely on the allegations in the [p]leading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing, such is not the case here." *Yankovich v. Applus Techs., Inc.*, 621 F. Supp. 3d 269, 276 (D. Conn. 2022) (quoting *Carter*, 822 F.3d at 57) (internal citations and quotation marks omitted).

Because Defendant's evidence reveals factual problems with Plaintiffs' assertion of subject matter jurisdiction, Plaintiffs cannot rely solely upon their contrary allegations in their complaint to establish standing and they "need to come forward with evidence of their own." *Carter*, 822

F.3d at 57. Following the Court's Order on August 10, 2023, Plaintiffs submitted declarations to controvert Defendant's extrinsic evidence. *See* Decl. of Joseph Lamb ("Lamb Decl."), ECF No. 43 and Decl. of Amber Stouffe ("Stouffe Decl."), ECF No. 44. In his declaration, Plaintiff Lamb states "[o]n multiple occasions, [he] watched standalone video content on Forbes' website on [his] phone and computer" and that "[o]n those same devices, [he is] also usually logged into [his] Facebook account." Lamb Decl. ¶ 2. Lamb also included an exhibit purportedly demonstrating that his subscription to Forbes predates May 2018. Lamb Decl. He also explained that Defendant's assertion that he created his account on July 14, 2022 is incorrect. *Id*. ¶ 5. Instead, Mr. Lamb explains that on that day, "to verfiy [his] subscription remained active," he "navigated to forbes.com, clicked the "sign in" button, and logged in using [his] Facebook account." *Id*. At no point was he required to sign up again. *Id*. Plaintiff Stouffe similarly states that "[o]n multiple occasions, [she] watched standalone video content on Forbes' website on [her] phone and computer" and that "[o]n those same devices, [she is] also usually logged into [her] Facebook account." Stouffe Decl. ¶ 2. Stouffe also included an exhibit purportedly demonstrating that her subscription to Forbes predates November 2021. Stouffe Decl. Defendant argues that the "off-Facebook activity reports"[2] attached to the Plaintiffs' declarations "show at most that they viewed content or a webpage on Forbes' general website." *See* ECF No. 45 at 1. Defendant explains that "this does nothing to contradict Forbes' showing that Plaintiffs only viewed pages, not videos, and in fact supports it." *Id*.

The Second Circuit instructs district courts to "make findings of fact in aid of its decision as to standing" when the "extrinsic evidence presented by the defendant is material and

---

[2] Defendant explains in its supplemental letter that the "off-Facebook activity tool is a Facebook self-help tool that purports to provide a summary of activity that businesses and organizations share with Facebook about users' interactions with their apps or websites." *See* ECF No. 45 at 1 n.1.

controverted." *Carter*, 822 F.3d at 58. Additionally, the Second Circuit has "recognized that a district court has 'considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction.'" *Harty*, 28 F.4th at 441–42 (quoting *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003).

The Court disagrees with Defendant's characterization. Although Defendant claims the Plaintiffs merely "parrot the allegations of the Complaint," the Court finds that the Plaintiffs have controverted the allegations in the Johnson declaration. Specifically, Plaintiff Lamb's evidence demonstrates, at least at this juncture, that his account with Forbes predates May 2018, *see* ECF No. 43-1, which calls into question Mr. Johnson's methodology in concluding that Plaintiff Lamb registered for the Forbes website on July 14, 2022—days before the initial complaint was filed. *See* Johnson Decl. ¶¶ 4–6. While Defendant appears to disparage the sufficiency of some of Plaintiffs' exhibits, the Court notes that Defendant has provided no exhibits to demonstrate the accuracy of Mr. Johnson's Declaration and how Forbes employees actually concluded that the Plaintiffs never "access[ed] any Forbes webpages dedicated solely to video content." *Id*. ¶¶ 5, 9. At this point, the Court acknowledges that this dispute is essentially the Defendant's word against the Plaintiffs' word. However, because Plaintiffs' declarations reveal serious questions about Mr. Johnson's review of the supposed "diligent searches" as described in his declaration, the Court resolves this factual dispute in Plaintiffs' favor and finds that Plaintiffs have sufficiently alleged they watched video content on Forbes' website and that Forbes disclosed their PII and video watching history to a third party. At this juncture, the Court's factual determination is limited to the issue of standing at the pleading stage. Defendant's motion to dismiss under Rule 12(b)(1) is accordingly **DENIED**.

## II. Failure to State a Claim

As explained previously, Defendant contends that Plaintiffs fail to state a claim under the VPPA (1) because Forbes is not a video tape services provider; (2) the information allegedly disclosed is not personally identifiable information ("PII"); and (3) Plaintiffs fail to allege Forbes knowingly disclosed their PII to a third party. *See generally* Mot. Additionally, in its supplemental letters, Defendant also argues that Plaintiffs are not "subscribers" under the VPPA,  ECF No. 32, 37, 39.

### A. Video Tape Service Provider

Forbes argues that it is not a "video tape service provider" within the meaning of the VPPA because Forbes is a news provider and because providing video content is not a "focus of the defendant's work." Mot. at 6 (quoting *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017). As recently explained by Judge Engelmayer, such "arguments are easily put aside." *Golden*, 2023 WL 5434378, at *4.

Defendant is wrong that it must be characterized "as a video store or other retailer primarily engaged in providing entertainment content" to fall under the VPPA. Reply at 6. The VPPA defines a video tape service provider as one "engaged in the business" of "delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). "This text is unambiguous" and "it looks to a video's format, rather than its subject matter or the provider's identity." *Golden*, 2023 WL 5434378, at *4. The Plaintiffs allege that Forbes "hosts and delivers thousands of videos, featuring them as standalone content and embedding them into articles" and that Forbes "monetizes these videos." SAC ¶ 15. Therefore, Forbes comes within the VPPA's definition of a video tape service provider. *See Golden*, 2023 WL 5434378, at *4 (finding that a defendant that provides "morning shows featuring news and entertainment" fall within the scope

of VPPA); *see also, Sellers v. Bleacher Rep., Inc.*, No. 23 Civ. 00368 (SI), 2023 WL 4850180, at *6 (N.D. Cal. July 28, 2023) (collecting cases in which courts have held "that websites that provide video content as well as other media content—including news organizations—are video tape service providers under the VPPA.").

### B. Disclosure of PII

Next, Defendant argues that the SAC does not adequately plead that Forbes discloses personally identifiable information ("PII") within the meaning of the VPPA. *See* Mot. at 7. The VPPA defines PII as "information which identifies a person as having requested or obtained specific video materials or services." 18 U.S.C. § 2710(a)(3). "Courts have interpreted this to require that a video tape service provider have disclosed information that at the very least, identif[ies] a particular person—not just an anonymous individual—and connect[s] this particular person with his or her viewing history." *Golden*, 2023 WL 5434378, at *5 (cleaned up);  *see In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015) ("There are, in other words, three distinct elements [in the VPPA's definition]: the consumer's identity; the video material's identity; and the connection between them.").

Defendant argues that Plaintiffs allege only that Forbes disclosed the name of a webpage URL and such disclosure is insufficient to identify Plaintiffs has having requested or obtained videos. The SAC alleges that because of Defendant's use of the Facebook Tracking Pixel, SAC ¶¶ 12-18,  the Defendant transmits four distinct events to Facebook: (1) "PageView," (2) "ViewContent," (3) "Purchase," and (4) "Lead." AC. ¶ 18, Fig. 3. "PageView" transmits the Uniform Resource Locator ("URL") accessed, along with whether that webpage features a video. *Id*. ¶ 19. "ViewContent" also discloses the URL and "whether the webpage features a video." *Id*. ¶ 20. The title for the video is contained in the URL, and Plaintiffs allege that "any third party can

copy and paste that locator into a web browser and determine the video that the subscriber watched" and that "these two events [PageView and ViewContent] independently and jointly, permit an ordinary person to identify a video's content, title, and location. *Id.* ¶¶ 21–22. The title for the video is contained in the URL, and any third party can copy and paste that locator into a web browser and determine the video that the subscriber watched. *Id.* ¶ 23. Defendant also uses "Advanced Matching," which transmits to Facebook "a subscriber's email address, first name and last name." *Id.* ¶ 40.

"Courts have uniformly held Facebook IDs to constitute PII under the VPPA, particularly where—as here—the plaintiff alleges that her Facebook ID was disclosed alongside the viewed video's URL and name." *Golden*, 2023 WL 5434378, at *6 (collecting cases). The SAC here alleges that Defendant disclosed the Plaintiffs' Facebook IDs and the URLs—including the video title—of the videos they accessed, and therefore the SAC adequately alleges that Forbes disclosed "specific video materials." *See Golden*, 2023 WL 5434378, at *7 ("insofar as the statutory definition of PII includes that the identified person 'requested or obtained specific video materials or services,' 18 U.S.C. § 2710(a)(3), the [complaint] also adequately alleges that [defendant] disclosed "specific video materials"—to wit, each video's URL and name."); *Harris v. Pub. Broad. Serv.*, No. 1:22-CV-2456-MLB, 2023 WL 2583118, at *5 (N.D. Ga. Mar. 20, 2023) (PII alleged where complaint alleged that Facebook ID, URL address, and webpage title only); *Feldman v. Star Trib. Media Co. LLC*, No. 22-CV-1731 (ECT/TNL), 2023 WL 2388381, at *9 (D. Minn. Mar. 7, 2023) (same); *Ambrose v. Bos. Globe Media Partners LLC*, No. CV 21-10810-RGS, 2022 WL 4329373, at *1–2 (D. Mass. Sept. 19, 2022; *Czarnionka v. Epoch Times Ass'n, Inc.*, No. 22 CIV. 6348 (AKH), 2022 WL 17069810, at *2–3 (S.D.N.Y. Nov. 17, 2022), *motion to certify*

*appeal denied*, No. 22 CIV.6348 (AKH), 2022 WL 17718689 (S.D.N.Y. Dec. 15, 2022); *cf.*

*Martin*, —— F.Supp.3d at ——, 2023 WL 2118074, at *3).[3]

        Additionally, Defendant argues that Plaintiffs have not adequately alleged facts making it

plausible that an ordinary person could identify an individual as having watched specific videos.

Mot. at 9. However, according to recent VPPA case law, "disclosure of the PII alleged here, a

Facebook ID, would 'readily permit an ordinary person to identify the specific individual's video-

watching behavior.'" *Golden*, 2023 WL 5434378, at *7 (quoting *Eichenberger v. ESPN, Inc.*, 876

F.3d 979, 985 (9th Cir. 2017) (collecting cases). Finally, Defendant argues that it cannot be liable

because according to the SAC, it is the user whose browser sends the cookies to Facebook, not

Forbes. Mot. at 10. This argument fails because the SAC alleges that Forbes took affirmative steps

to install and use the Facebook Tracking Pixel, which causes the transmission of the information

to Facebook, SAC ¶¶ 12, 18, 80. "By installing the [Facebook Tracking] Pixel, Defendant opened

a digital door and invited Facebook to enter that door and extract information from within."

*Czarnionka*, 2022 WL 17069810, at *3; *see also Golden*, 2023 WL 5434378, at *7 n.9 (rejecting

identical argument); *Harris*, 2023 WL 2583118, at *5 (same).

        Accordingly, the SAC adequately alleges that Today.com disclosed PII within the meaning

of the VPPA.

---

[3] Defendant relies on *Martin v. Meredith Corp.*, but this case is distinguishable. See Mot. at 8 (citing ——
F.Supp.3d at ——, 2023 WL 2118074, at *3). In that case, the complaint generally alleged that the
defendant "caus[ed] the … titles of the videos viewed to be shared with Facebook," but its other allegations
"reveal[ed]" "that the information disclosed d[id] not actually include the title of a video," but only the
name of the webpage visited. *Id*. at *4. The court in *Martin* found a failure to allege PII as statutorily
defined, holding "simply disclosing the name of a webpage and an associated Facebook ID leaves off
essential information for a VPPA claim." *Id*. Here, however, Plaintiffs allege that Defendant discloses "the
URL and whether the webpage features a video." SAC ¶ 20.

### C. "Knowing" Disclosure

Forbes  argues that the SAC does not adequately allege that it disclosed PII "knowingly" within the meaning of the VPPA. Mot. at 10. Defendant argues that there no well-pleaded allegations that Forbes had "actual knowledge" that PII was disclosed to Facebook. *Id*. at 11.

Here, the SAC alleges that Forbes discloses a subscriber's email address, first name, last name, SAC ¶ 40, and that "Forbes knows that Facebook will match the Advanced Matching parameters with a subscriber's subsequent activity, thereby helping Forbes '[i]ncrease the number of attributed conversions,' '[i]ncrease [its] Custom Audience size,' and '[d]ecrease the cost per conversion." SAC ¶ 41. Additionally, the SAC alleges that Forbes integrated or installed the Facebook Tracking Pixel into its website, *id*. ¶¶ 12, 18, and that it chose to activate the optional "Advanced Matching" tool, *id*. ¶¶ 35–36. This is sufficient to allege Forbes acted "knowingly." *See Golden*, 2023 WL 5434378, at *8 (standard of knowing disclosure met where complaint alleged that defendant took affirmative steps to install, and program the Facebook pixel to collect and transmit information regarding each visitor's on-demand video viewing, and that it did so to profit from advertising and information services, with the understanding that the pixel would transmit users' information to Facebook); *Harris*, 2023 WL 2583118, at *6–7 (standard of "knowing" disclosure met where complaint alleged defendant programmed the Facebook pixel into its website code, knowing that Facebook would receive users' viewing information); *Belozerov v. Gannett Co.,* No. CV 22-10838-NMG, 2022 WL 17832185, at *4 (D. Mass. Dec. 20, 2022) at *4–5 (same); *Czarnionka*, 2022 WL 17069810, at *3 (same).

Accordingly, the SAC adequately alleges that Defendant knowingly disclosed PII within the meaning of the VPPA.

### D.  "Consumer"[4]

Finally, Defendant argues, in its supplemental letters, that Plaintiffs are not "consumers" under the VPPA. *See* ECF Nos. 32, 37, 39. The VPPA defines consumer as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a). The parties focus on whether either Plaintiff qualifies as a "subscriber." *See* Defendant's supplemental letters at ECF Nos. 32, 37, 39; Plaintiffs' supplemental letters at ECF Nos. 33, 38, 40.

The SAC alleges that "Plaintiff Lamb subscribed to Forbes by creating an account through the Facebook button" SAC ¶ 50, and that Plaintiff Stouffe "subscribed to Forbes by signing up for a newsletter, 'Forbes Vetted,' that Defendant created, advertising it as providing information 'on sales and deals, plus the latest fashion, home and tech products." SAC ¶ 56. Neither Plaintiff alleges to have paid to subscribe to Forbes or any of their newsletters.

Although the VPPA does not define "subscriber," several courts within this district have tackled this issue directly. Moreover, courts have examined the following non-dispositive factors to determine an individual's relationship with the provider: "sign[ing] up, register[ing] for an account, establish[ing] a user ID or profile, download[ing] an app or program, or tak[ing] any action to associate herself with [the provider]." *Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662, 669 (S.D.N.Y. 2015) (internal quotation marks omitted); *see also Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1256 (11th Cir. 2015) ("Subscriptions involve some or [most] of the following [factors]: payment, registration, commitment, delivery, [expressed association,] and/or access to restricted content.").

 As recently explained by Judge Engelmayer, "to qualify as a consumer under the VPPA, a person must rent, purchase, or subscribe 'to audio visual materials, not just any products or

---

[4] Neither party asserts that Plaintiffs are "renters" or "purchasers," but they instead focus on whether Plaintiffs qualifies as "subscribers."

services from a video tape provider.'" *Golden*, 2023 WL 5434378, at *11 (quoting *Salazar*, ⸺ F.Supp.3d at ⸺, 2023 WL 5016968, at *8); *see, e.g.*, *Carter*, ⸺ F.Supp.3d at ⸺, 2023 WL 3061858, at *6. The court in *Golden* also specifically reasoned that "the courts to consider the question have further, overwhelmingly, held that, to qualify as a subscriber under the VPPA, a plaintiff must allege more than either having (1) merely downloaded a free mobile app, or (2) merely signed up for a free email newsletter unrelated to her video viewing." *Id.* at *10 (cleaned up). Based on this recent persuasive and well-reasoned case law, the Court agrees with Defendant that Plaintiffs do not plausibly allege that they were subscribers of Defendant's videos.

First, as to Plaintiff Stouffe, the Court agrees with the *Carter, Salazar,* and *Golden* courts' analyses of a similar newsletter arrangement with a website. In *Carter*, the court observed that "[t]he newsletters may entice or encourage recipients to view hgtv.com videos, but there is no assertion that a newsletter subscription was required to access those videos, functioned as a login, or gave newsletter subscribers extra benefits as viewers." *Carter*, ⸺ F.Supp.3d at ⸺, 2023 WL 3061858, at *6. Additionally, the court noted that the complaint did not include facts that plausibly allege that the plaintiffs' "status as newsletter subscribers was a condition to accessing the site's videos, or that it enhanced or in any way affected their viewing experience" and thus, "they were subscribers to newsletters, not subscribers to audio visual materials." *Id.*; *see also Salazar*, ⸺ F.Supp.3d at ⸺, 2023 WL 5016968, at *8 (in agreement with *Carter*).

Here, the SAC alleges that Plaintiff Stouffe signed up for a Forbes newsletter with her email address and that since creating her Facebook account in or around 2011, she "frequented Forbes' website to [] watch videos." SAC ¶¶ 56–59. However, the SAC is "devoid of allegations linking [Stouffe's] having signed up for the [] newsletter to her viewing of [Defendant's] video offerings," nor does the SAC allege that Stouffe's "access of these videos was facilitated in any

way by her having signed up for the newsletter." *Golden*, 2023 WL 5434378, at *11. Additionally, the SAC does not allege that Stouffe "view[ed] videos through links embedded in email newsletters" and "it is devoid of details as to the content, format, or frequency of these newsletters." *Id*. (citing *Jefferson v. Healthline Media, Inc*., No. 3:22-CV-05059-JD, 2023 WL 3668522, at *3 (N.D. Cal. May 24, 2023) (dismissing VPPA claim where plaintiff alleged that she gave defendant her name and email address to subscribe to its email list, but "no information [was] provided about th[at] list"); *Carter*, 2023 WL 3061858, at *6. As in *Carter*, Stouffe does not allege that her "status as [a] newsletter subscriber[] was a condition to accessing the sites videos, or that it enhanced or in any way affected [her] viewing experience." *Carter*, 2023 WL 3061858, at *6. As such, the SAC's allegations regarding the newsletter do not qualify Stouffe as a "subscriber" under the VPPA. *Id*.

Although the *Salazar*, *Carter*, and *Golden* courts addressed only plaintiffs who alleged they were a "subscriber" because of their subscription to an email newsletter, the Court finds this reasoning may logically extend to instances where plaintiffs allege that they created an account directly on the website. In fact, in *Gardener v. MeTV*, a court within the District Court of Northern Illinois, applied the reasoning of the *Carter* court to plaintiffs who had "opened an account" on the defendant's website. *See Gardener v. MeTV*, No. 22 CV 5963, 2023 WL 4365901, at *4 (N.D. Ill. July 6, 2023). The *Gardener* court  stressed that "anyone can view videos on [defendant] MeTV's website, without the need for a login." *Id*. at *3. The *Gardener* court ultimately held that the *Carter* plaintiffs were indistinguishable from the plaintiffs in the case before it because "both had subscriptions (newsletter or website) of a kind that were unconnected to their ability to access video content," "[n]either set of plaintiffs paid for this privilege, made any commitment to do so, otherwise exchanged anything of value to do so, or received special access to certain content." *Id*.

Thus, the court concluded that the plaintiffs were "subscribers to a website, 'not subscribers to audio visual materials.'" *Id.* (quoting *Carter*, ⸺ F.Supp.3d at ⸺, 2023 WL 3061858, at *6).

Here, Plaintiff Lamb alleged he created an account on the Forbes website. SAC ¶ 50. Based on Plaintiff's allegations, it is not clear to this Court that his alleged subscription was "[]connected to [his] ability to access video content." *See Gardener*, 2023 WL 4365901, at *4. For example, Plaintiff Lamb does not explain if an account is "required to access [] videos," *Carter*, ⸺ F.Supp.3d at ⸺, 2023 WL 3061858, at *6, or if his account "allowed him access to [] videos on [forbes.com] that any member of the public [i.e., someone without a Forbes account] would not otherwise have." *Salazar*, ⸺ F.Supp.3d at ⸺, 2023 WL 5016968, at *9; *see also Ellis*, 803 F.3d 1251, 1256 (11th Cir. 2015) (listing "access to restricted content" as a factor in assessing a "subscriber"). Additionally, Plaintiff does not allege if he was given "extra benefits as [a] viewer" *Carter*, ⸺ F.Supp.3d at ⸺, 2023 WL 3061858, at *6, or, relatedly, if he "receive[d] [any]thing in return for a [Forbes] login," *Gardener*, 2023 WL 4365901, at *5.

In Plaintiffs' supplemental letter, ECF No. 38, they argue that *Gardener* is inapplicable here because "unlike Defendant's website, metv.com gives non-subscribers unbridled access to its content, webpages, and videos without placing any restrictions or caps on non-subscribers' access to the website or forcing them to disable ad-blockers" and "[b]y contrast, Forbes places strict limits on non-subscribers' access to its web pages, videos, and content, limiting them to 'four free articles,' measured by individual web page views." *See* ECF No. 38. Plaintiffs, also argue that "a viewer of Defendant's audio visual material must subscribe and requires the subscriber's email address with every log-in attempt." ECF No. 40. First, the Court notes that the SAC provides no allegations concerning Forbes' "four free articles" limit and therefore cannot consider this argument. In any event, Plaintiff fails to explain how an *article* limit is relevant to a claim under

the VPPA. Plaintiff does not allege how such limitations of articles is related to the video content offered by Forbes. Moreover, Plaintiffs cite to paragraphs 38 and 39 of the SAC to support their argument that they "must subscribe" to view Defendant's audio visual material. However, this argument is directly contradicted by the SAC, which alleges that "[t]o subscribe to Forbes, a user *can* create an account" and that "[e]very subsequent log-in attempt requires subscribers to input their email." SAC ¶¶ 38-39 (emphasis added).

Finally, Plaintiffs generally fails to allege the exact mechanisms of the video content offered by Forbes. For example, does Forbes create its own original video content or does it host exclusive video content that can only be accessed on forbes.com, and if so, can this video content only be accessed by a person who holds a Forbes account like Plaintiff?  Therefore, as currently alleged in the SAC, this Court finds that Plaintiff Lamb is a "subscriber[] to a website, not [a] subscriber[] to audio visual materials" as required by the VPPA. *Gardener*, 2023 WL 4365901, at *4 (N.D. Ill. July 6, 2023).

In conclusion, the Court does not find that Plaintiff Stouffe's subscription to Defendant's newsletter or Plaintiff Lamb's subscription to the Forbes website rendered them "subscribers" of goods or services from a video tape service provider within the meaning of VPPA. Accordingly, Plaintiffs' claim under the VPPA is **DISMISSED.**

### III. Leave to Amend

"The court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "[T]he Second Circuit has construed this 'liberal standard' to bespeak a 'strong preference for resolving disputes on the merits.'" *Golden*,  2023 WL 5434378, at *12 (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015)). Additionally, the circumstances that often counsel against granting leave to amend—such as undue

delay, bad faith, dilatory motive, or futility—are not present. *Loreley Fin. (Jersey) No. 3 Ltd.*, 797 F.3d at 190. Therefore, Defendant's motion to dismiss is granted without prejudice.

Specifically, the Court will permit Plaintiffs to amend the SAC for the limited purpose of adding factual allegations as to the operation of the Forbes account and newsletter and their direct, specific connection to the video content allegedly hosted on the Forbes website. The SAC's sparse allegations on these subjects make it theoretically possible that such an amendment could fortify Plaintiffs' claim to have been subscribers under the VPPA. Plaintiffs will not have further opportunities to amend.[5]

## CONCLUSION

For the foregoing reasons, Defendant's motion pursuant to Rule 12(b)(6) is **GRANTED without prejudice**. The Clerk of the Court is respectfully directed to terminate ECF No. 26. Plaintiffs may file a motion to amend their complaint a third time on or by **October 13, 2023.** Defendant's response, if any, may be filed **October 27, 2023.** Plaintiff's reply, if any shall be due **November 1, 2023**.

**SO ORDERED.**

**Dated:    September 28, 2023**
               **New York, New York**

**ANDREW L. CARTER, JR.**
**United States District Judge**

---

[5] The parties are also directed to refrain from using supplemental letters to raise new arguments not briefed in any future motion to dismiss without leave from this Court.